### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ARLINGTON LF, LLC,

      Appellant,

         v.

ARLINGTON HOSPITALITY, INC., *et al.*,

      Appellees.

No. 07 C 3632
Judge James B. Zagel

### MEMORANDUM OPINION AND ORDER

This is a bankruptcy appeal in which Arlington LF, LLC ("LF" or "Lender") appeals a bankruptcy court order denying its motion for post-petition administrative expenses and secured claims. Lender provided post-petition financing to Arlington Hospitality, Inc. ("Arlington" or "Debtor") that provided for Lender to receive certain fees and expenses. After Debtor refused to pay certain fees and expenses, Lender filed a motion for payment of those fees before the bankruptcy court. The bankruptcy court, in its May 2007 order, denied Lender's motion. The bankruptcy judge determined that Lender had anticipatorily repudiated its agreement with Debtor and therefore concluded that Lender was not entitled to the fees set forth in the parties' agreement. LF appeals.

## I.  BACKGROUND

This case arises because Debtor—a developer and operator of roadside hotels—faced a set of dire financial circumstances. In response to its predicament, Debtor prepared to file a Chapter 11 bankruptcy petition. On a parallel track with its preparations to file for bankruptcy protection, Arlington also sought to find an entity that would provide debtor-in-possession ("DIP") financing.

It was in this context that Arlington commenced discussions and negotiations with LF. Within just a few short days, the parties negotiated an agreement whereby LF would provide post-petition financing for Arlington. The parties memorialized this agreement in a document entitled "Outline of Terms and Conditions for Total DIP Financing Facility" ("Term Sheet"). The Term Sheet provided for a "Total DIP Facility" of $11 million. The DIP facility consisted of three components: a revolving loan not to exceed $6 million ("Revolver"); a $1 million term loan to be made available after December 31, 2005; and a $4 million term loan to fund the purchases of five executory contracts of unimproved real estate. On the same day the Term Sheet was executed, Arlington filed its Chapter 11 petition.

Among the "first-day" motions Debtor filed was one pursuant to 11 U.S.C. § 364(c) and (d) seeking authorization to obtain post-petition financing. Attached to the motion were an executed copy of the Term Sheet; a draft "Interim Order Authorizing Incurrence of Indebtedness" ("Interim Order"); and a spreadsheet (connected to the Interim Order) called "the Budget." Despite objections from some of Debtor's creditors, the bankruptcy court granted Arlington's motion and entered the Interim Order. The creditors' objections were based on the size of the fees, but in the Interim Order, the bankruptcy court found that:

> [t]he terms of the DIP Financing, taken as a whole, are more favorable to the Debtors than those available from alternative sources. The terms of the DIP Financing have been negotiated in good faith and at arm's length between the Debtors and Lender, are fair and reasonable under the circumstances and are enforceable according to their terms.

Interim Order, at 3.

The Term Sheet and the Interim Order were similar in several material respects, but were by no means identical. Much of the dispute below involved which of these documents governed;

2

the Interim Order made clear that it was to control.  It stated both that Debtor could borrow

money "on the terms and conditions contained in this Order;" and that "[a]ll post-petition

advances made by Lender to the Debtors shall be . . . made in accordance with the terms of this

Order."  Interim Order, at 4; *see also* Memorandum Opinion Below at 15-20 (holding that the

Interim Order was the operative document).

The Interim Order explained the terms of the $6 million Revolver.  It listed $6 million as

the "Initial Loan Amount."  It also laid out the regular and default interest rates and all of the fees

mentioned in the Term Sheet, including "Commitment Fee: $100,000, payable immediately" and

"Total DIP Facility Funding Fee: $210,000.00[,] payable immediately."  Interim Order at 4-5.  In

addition, the Interim Order provided that Arlington would pay to LF "all of the Lender's fees,

costs and expenses incurred in these cases, including all reasonable attorneys' fees and expenses,

upon invoice."  Interim Order at 6.

The Interim Order also granted super-priority status under 11 U.S.C. § 364(c)(1) to

Arlington's "Post-Petition Obligations," i.e., the loan principal, the interest, and the fees.  Interim

Order at 1, 5.  The Interim Order also provided for "Events of Default."  One of them was "[t]he

failure of the Debtors to make any payment described in paragraph 5 of this Order."  Interim

Order at 6.  Like the Term Sheet, the Interim Order granted LF a ten-day period under which

Arlington could only negotiate the terms of an asset purchase agreement, or enter into such an

agreement, with LF.  Interim Order at 8.

One of the significant differences between the Term Sheet and the Interim Order is that

the Term Sheet—unlike the Interim Order—had a "Use of Proceeds" provision.  According to

the Term Sheet, the financing could be used to "pay fees and expenses associated with this

transaction." The Interim Order contained no such provision, and the Budget attached to the Interim Order indicated that the 'DIP Fees" were to be paid with separate funds—not drawn from the Revolver—that Arlington would have to secure on its own.

On September 7, days after the Interim Order took effect, Debtor began to utilize Revolver funds. LF wired $3,530,000 to LaSalle Bank, paying off Arlington's pre-petition loan from LaSalle in full. Despite the fact that the Interim Order called for certain of the fees to be paid "immediately," Arlington did not pay the various loan fees. Officials at Debtor testified that they believed that those fees had been paid through a draw on the Revolver.[1]

Within weeks of the entry of the Interim Order, things began to sour. Individuals at LF began to worry about the decision to enter into the deal. On September 29, Richard Marks (LF's General Counsel) and Richard Morgner (Debtor's investment banker) had a conversation in which Marks stated that LF was unwilling to "fund any more money under the DIP."

Less than a week later, an attorney for the creditor's committee was engaged in an e-mail exchange with another of LF's attorneys. During the course of that conversation, LF's attorney stated:

> We are not willing to proceed further with the DIP loan; in other words, we will make no further loans to the Debtors. The lien granted to us by the interim orders [sic] secures the existing indebtedness. We think the Debtor should find a new DIP lender to pay out our loan and fund the options that expire at the end of this month.

---

[1] Arlington believed—based upon the Term Sheet—that the fees were going to be paid through the Revolver. The Interim Order—again, purportedly the controlling document—did not specify that the fees would be paid out of the Revolver and the Budget attached to the Interim Order did not account for payment of the fees.

4

It was not until after these discussions (one on the phone and the other via e-mail) that LF

sent an invoice to Arlington.  Debtor did not pay the invoice.  On October 20, LF faxed Debtor a

letter declaring a default.  Then, at an October 25 hearing before the bankruptcy court, both

Debtor and LF agreed that no final order authorizing post-petition financing should be entered.

In December 2005, the court entered an order approving the sale of Debtor's assets to

Sunburst Hospitality.  The month after the closing, Arlington repaid LF the more that $3.5

million that constituted the principal balance borrowed under the Interim Order.  Arlington also

paid non-default interest.  However, Debtor refused (and continues to refuse) to pay LF default

interest or any of the fees associated with the loan.

Faced with Debtor's refusal to pay these sums, LF brought a motion for payment of these

sums as administrative expenses.  After a trial in front of the bankruptcy court, the bankruptcy

judge issued a Memorandum Opinion and Order denying LF's motion.

The court first held that it was the Interim Order—and not the Term Sheet—that

constituted the parties' agreement.[2]  It then went on to hold that Richard Marks' September 29

conversation with Richard Morgner and LF's counsel's October 4 e-mail constituted an

anticipatory breach of the agreement.  The court determined that as a result of the anticipatory

repudiation, LF was not entitled to recover the fees or expenses it was seeking.  This appeal

followed.

---

[2]Neither side attacks this point (that the Interim Order controls) on appeal, thus, I do not take up that determination here.  For the purposes of this opinion, I assume that it was the Interim Order that governed the parties' relationship vis-a-vis the Revolver.

5

II.     **DISCUSSION**

Before turning to whether LF anticipatorily repudiated the agreement, it is necessary to

address an antecedent question, i.e., whether Debtor breached the agreement before the events

which constituted LF's supposed anticipatory repudiation occurred.  It is important to confront

this question first, because if Debtor was in breach at the time Lender supposedly repudiated the

agreement, then Debtor cannot claim that it did not have to perform as a result of Lender's

actions.  Despite the relative lack of attention this issue received in the briefing, it proves

outcome determinative.

I conclude that Debtor was in breach of the agreement at the time LF supposedly

repudiated.  The Interim Order states: "The Debtors shall pay to the Lender all of the Lender's

fees, costs, and expenses incurred in these cases, including all reasonable attorneys' fees and

expenses, upon invoice."  Interim Order at 6.  Debtor relies on this passage and argues that it was

not in breach at the time of the supposed repudiation because the events purportedly constituting

anticipatory repudiation came *before* LF ever submitted an invoice to Debtor.  LF, on the other

hand, argues that the Interim Order required Debtor to pay certain fees "immediately," and

because Debtor had not paid those fees, Debtor was in breach of the agreement.  Indeed, the

Interim Order does state that the $100,000 Commitment Fee and the $210,000 Total DIP Facility

Funding Fee are "payable immediately."  Interim Order at 5, ¶¶5(d) and (e).

The bankruptcy court did not confront this issue directly; nevertheless, it implicitly held

that the Interim Order did not require Debtor to pay the various fees until LF presented an

invoice.  The bankruptcy court's opinion noted that "LF's fees were payable . . . 'upon invoice.'"

Memorandum Opinion Below at 20.  The opinion also stated that "Arlington was indeed

6

obligated to pay LF's fees upon invoice . . . ."  *Id.* at 24.  I review a bankruptcy court's contract

interpretations *de novo*.  *Universal Guar. Life Ins. Co. v. Coughlin*, 481 F.3d 458, 462 (7th Cir.

2007).[3]

      While the bankruptcy court determined that the fees Debtor owed to LF were only

payable "upon invoice," I disagree.  One section of the Interim Order, specifically ¶¶5(d) and (e),

expressly and specifically make the $100,000 Commitment Fee and the $210,000 Total DIP

Facility Funding Fee "payable immediately."   Interim Order at 5.  Separately, ¶8 states that "all

of the Lender's fees, costs, and expenses *incurred in these cases*, including reasonable attorneys'

fees and expenses" are to be paid "upon invoice."   *Id.* at 6 (emphasis added).  The "fees" referred

to in ¶8 are distinct from the Commitment Fee and Total DIP Facility Funding Fee listed in ¶5.

Because I conclude that they are different fees, it follows that while Debtor was not responsible

for paying the fees referred to in ¶8 until presented with an invoice, it was responsible for the

Commitment Fee and the Total DIP Facility Funding Fee immediately.

      Paragraphs 5 and 8 are referring to different fees.  First, and most obviously, the Interim

Order references "fees" in two separate paragraphs.  It would lack coherence to refer to fees

specifically in one paragraph, and then re-refer to those same fees 3 paragraphs later.  The far

---

[3]It is an interesting question whether the bankruptcy court's interpretation of this
agreement commands enhanced deference.  Because LF was lending money to Arlington in the
context of a Chapter 11 bankruptcy, the deal required the approval of the bankruptcy court.
Thus, the agreement that controlled here was not a document drafted by the parties, but rather a
Court Order signed by the bankruptcy judge.  Therefore, in a real sense, the bankruptcy judge
was interpreting language that he himself drafted (this may be a "legal fiction" that ignores the
fact that, in all likelihood, the parties supplied the pre-drafted Order to the judge for his
signature).  The resolution of this question is immaterial here, though, because I would reverse
this interpretation irrespective of the standard of review I employed.

more likely answer is that the two paragraphs refer to separate fees.  Thus, the fact that two separate paragraphs refer to fees suggests that each paragraph refers to different fees.

Second, both paragraphs contain language concerning when the payments are due, yet the paragraphs set forth different times.  This also suggests that the two paragraphs are not referring to the same fees.  Paragraph 5 lists the two specific fees and states that they are "payable immediately."  By contrast, the fees laid out in ¶8 are to be paid "upon invoice."  The fact that one set are to be paid "immediately" and another are to be paid "upon invoice" suggests that the two paragraphs are referring to different fees.  Debtor attempts to get around this by arguing the "paragraph 6 [sic – presumably Debtor means "5"] deals with LF's entitlement to and earning of fees and paragraph 8 deals with the payment of fees."  This purported explanation fails.  It simply does not make sense to say that ¶5 does not deal with the "payment of fees" when that paragraph explicitly states that those fees are *payable* immediately."  Interim Order at 5 (emphasis added).

Third, the language "incurred in these cases" in ¶8 suggests that the fees discussed in that paragraph are different than the fees discussed in ¶5.  Because the larger framework in which the parties were negotiating was a Chapter 11 bankruptcy, it was eminently conceivable that Lender would be concerned about the accrual of attorneys' fees and other expenses in connection with the bankruptcy process.  The fact that there is an extra layer of process required in order to consummate a deal invariably adds additional costs.[4]  This explains why a second paragraph is needed.  Paragraph 5 set forth a number of fees associated with the loan itself, and paragraph 8 tacked on additional fees due to the expense Lender would have to incur as a result of the process

---

[4]For example, the parties negotiated the Term Sheet, but then had to go to court to get the court to enter the Interim Order before Debtor could actually borrow any money.

taking place in the context of a Chapter 11 bankruptcy case.  This explanation accounts for the use of two different paragraphs, because the two paragraphs refer to separate fees.  It also explains the inclusion of the "incurred in these cases" language in ¶8, because the fees included in that paragraph are those additional fees that result from the bankruptcy process.  In addition, this explains why the fees in ¶5 were payable immediately (because the amounts were set at the time the Interim Order was drafted), whereas the fees in ¶8 were payable "upon invoice" (because the amounts would not be known until the cases progressed and the fees and expenses were actually incurred).  The "incurred in these cases" language in ¶8 further supports the notion that the fees referred to in that paragraph are different than the fees listed in ¶5.

In sum, I conclude that the "fees" referred to in ¶8 are separate and distinct from those fees set out in ¶5.  Thus, the phrase "payable immediately" (found in ¶¶5(d) and (e)) controls for the Commitment Fee and the DIP Facility Funding Fee, and the phrase "upon invoice" controls for "those [fees] associated with Lender's participation in the 'cases' as a litigant."

The Interim Order was entered on September 2, 2005.  It listed the "Commitment Fee" and the "Total DIP Facility Funding Fee" as "payable immediately," yet Debtor has still not paid those fees.  Therefore, pursuant to the terms of the Interim Order, Debtor was in default on September 29 when Lender purportedly repudiated the agreement.  *See* Interim Order at 6-7 (¶¶12-14).

At least one Illinois court has held that "where a plaintiff sues on an anticipatory breach prior to the time when defendant's performance is due, he must show an ability and willingness to perform his part of the contract within the time specified in the contract."  *Yale Development Co. v. Aurora Pizza Hut, Inc.*, 420 N.E.2d 823, 826 (Ill. App. Ct. 1981).  A corollary to that rule

9

is that a party in default cannot complain of the other party's anticipatory repudiation.  In this case, Debtor was in default at the time LF supposedly repudiated the agreement.  Therefore, it cannot simply claim that Lender anticipatorily breached and withhold performance.[5]

## III.   <u>CONCLUSION</u>

I conclude that the Commitment Fee and the DIP Facility Funding Fee were payable immediately.  Accordingly, Debtor was in default with respect to at least those obligations at the time Lender purportedly repudiated.  For these reasons, the bankruptcy court's opinion is vacated and this case is remanded for further proceedings consistent with this opinion.


ENTER:

James B. Zagel
United States District Judge

DATE: November 9, 2007

---

[5]Because I conclude Debtor was in default, I need not and do not reach the question of whether the bankruptcy court properly concluded that the September 29 phone call and the October 4 e-mail constituted anticipatory repudiation.